Thank you, Your Honor. May it please the Court, I'm Bob Maynard with Perkins Coie Law Firm, speaking for the Appellant Recreation Groups today. I do refer the Court to our briefs for the entirety of our arguments, and I'm going to try to reserve about five minutes for a little time out of my allotted 20 minutes with the permission of the Court. These appellant groups represent a range of winter and summer motorized and bicycle backcountry recreation users of good root national forest lands. They're looking for a balance in the areas available for motorized and bike use versus non-motorized use, and they're challenging the lack of balance in the Forest Service travel plan decision at issue here, namely closing the two wilderness study areas and the two recommended wilderness areas on the Bitterroot entirely to motorized or mechanized recreation use. Just for context, of the 1.6 million acres on the Bitterroot National Forest, about half are congressionally designated wilderness where no motorized or mechanized recreation use is allowed. There's an additional nearly 8 million acres of designated wilderness on national forests and other federal lands within 200 miles of the Bitterroot Valley that the Bitterroot sits around. This huge acreage is permanently available to non-motorized recreationists and generally closed to snowmobile, summer wheeled motorized, or bicycle recreation use. The two wilderness study areas in contention total about 110,000 acres, and the two recommended wilderness areas about 76,000 acres. These are not designated wilderness, but relatively high elevation remote areas valued by motorized, bicycle recreationists for solitude, challenging terrain and scenery. The Forest Service, in a 1985 report and its 1987 forest plan, has already determined that the entire Sapphire wilderness study area and over half of the Blue Joint wilderness study area are not suitable to recommend for wilderness designation. That's in our open brief at 21. Until the 2016 Forest Service travel plan is issued here, substantial portions of these have remained available for many years for summer and winter motorized. Mr. Maynard, if I can interrupt, we're familiar with the record and pretty much with everything that you've recited accurately. It seems to me that the core of the case is whether or not the Forest Service properly figured out, at least as best it could, what the use level was in 1977. And it relied on the analysis of Mr. Stockman to determine that. And your objection is that that really is insufficient to tell us what that was. Can you help me out and tell me why there was better evidence or that was improper evidence? Yes, Your Honor. Basically, that's two reports on wilderness study areas by Mr. Stockman. And it just took, they had one piece of data in 1985 and just interpolated, extrapolated, whatever you want to call it, under some kind of conceptual approach to come up with what are to us incredibly exaggerated potential numbers of increased use since 1977 in these areas. Do you have better evidence that the Forest Service should have looked at? There's better evidence in the record, Your Honor, in terms of 2003 and 2006 reports on these two wilderness study areas that show no actual diminishment in use. Excuse me, wilderness character in either area. No large increases in use. There's a 2009 monitoring study that indicates low levels of use. The forest supervisor ultimately, looks like she may have thrown up her hands in terms of the data from the Stockman report being contradicted and not reliable. And really just ultimately determined to prohibit all bicycle use and as well as motorized use in both these areas just because... For example, in 1977, I don't think you dispute in 1977 there was no bicycle use, isn't that right? Well, the Stockman report says they don't believe there is. And there's no actual data of bicycle use then. Do you have any evidence to the contrary that there was bicycle use in 1977? No, there's nothing in the record. I think anybody who was hiking in the woods in 1977 would be able to tell you that not only is there no evidence of it, there wasn't any. Your Honor, the Forest Service didn't survey people and ask them, as far as I can tell in the record, about 77. But at any rate, no, there's no data showing bicycle use in 1977. So your client has not produced any evidence that contradicts the conclusion on that point? Not to my knowledge in the record, Your Honor. But I do want to note in that regard that the cases that are cited by the Federal Land Intervenor Police, particularly the Russell Country and the McAllister cases, don't require the Forest Service to be precise about levels of use in 1977 versus now. They don't require them to replicate the conditions in 1977. They talk about an approximate and qualitative approach. And that doesn't preclude allowing some bicycle use. That still allows them to maintain the wilderness character and opportunities for solitude that the cases focus on. They do not prohibit increased or changed use as long as those qualities are being maintained. And the thing is, the Forest Service never did that hard look analysis here. They never got to it. They disregarded the contradictory information about whether there really is a large amount of increased use or an excessive amount of bike use or whatever. And instead just went by this internal region guidance that is part of our argument. They should not have allowed that to have the influence it did, including trying to prevent constituencies from developing that would oppose wilderness designation. That's in our briefs. Bottom line, they ultimately prohibited both bicycle and motorized uses from the entirety of both these wilderness study areas without regard to their effects, without taking that hard look, and without having good data in the record. If you look at the sections of the EIS as well as the law that are in the record, the excerpts of record, there's plenty of indications that there's just very little impact and still relatively low use. So I'll take a moment on the factor that they should not have, the Forest Service should not have considered in their decision, which if that's the case, if an agency decision maker takes into account considerations that Congress did not make relevant, then the actions really can't stand. We cite the Volpe case in our opening brief, and I would also refer the court to the McAllister case and the State of New York versus Department of Commerce, Supreme Court case, recent case. For the basic rule, the reliance on an improper factor amounts to arbitrary and capricious action in the APA. This reliance on a regional level guidance about basically just managing recommended wilderness areas the same as designated wilderness is set out in our brief in terms of it being very influential and consistent from the beginning to the end of the process. In the record of the decision itself, the Forest Service states as a reason for decision, the perceived need to prevent a constituency for motorized mechanized recreation in these areas to develop influence eventual wilderness designation. That stated reason has nothing to do with recreation use actually degrading wilderness character or affecting the existing potential for possible wilderness designation. It had everything to do with attempting to impair political advocacy against wilderness designation that might further develop from continued or increased use. Excuse me. And that consideration, that factor is outside the criteria in the Montana Wilderness Studies Act, the Forest Plan, National Forest Management Act, APA, Travel Management Rule, legal framework that applies here. I think I've already certainly made an effort to address your question about not considering actual wilderness character and effects. It is another reason we feel the decision was arbitrary and capricious. And the stock analysis doesn't hold up. It's not doing the best that they could with the data they had. They had a lot of data including the reports I've cited that indicate low use, lack of conflict. What you've got basically in the record of decision and sections of the EIS that are included in the excerpts are some mostly general statements about potential effects. Some statements about effects being less or more for various alternative basis on difference in uses allowed. And then plenty of statements indicating level of use and effects are low or minor. And our point is the Forest Service disregarded this in prohibiting all motorized and mechanized uses in both the study areas and the recommended areas. I will cite you to the ONDAV Rose case in our opening, cited in our opening brief at 41. And Wilder Guardian's case cited in the intervener's brief regarding the need for more than general conclusions about potential effects that might meet our requirements. I'll point to just a few of the statements about lack of conflict and low use. The rod itself, record 514, in summary off-road motorized use has never been a huge problem on the Federated National Forest. In the EIS, excerpts of record 694, snowmobiles, uses transitory, no vegetation and other type effects. Excerpts of record page 442 and pages after that is a letter from the bicyclist, but about certainly consistent with the EIS on lack of noise, other impacts with that use. Sections of the EIS cited by the interveners, ISER pages 95 and 96, over snow, non-motorized use, that is skiers, snowshoers in the winter is near the trailhead. There's not much of it in any case. And if you go to ISER 303, where the interveners have talked about some wildlife disturbance impacts, cited that. The EIS talks about some seasonal and short-term effects of motorized and mechanical use on animal movement and so on. But the cumulative effects are negligible. That's the kind of thing I'm talking about in terms of the ultimate decision to not look at differentiations between these types of uses. To not look at actual effects and to reach over conclusory, unsupported determinations is flawed and we're looking for that to be remanded to the Forest Service for further study and review, considering the proper criteria. We're not asking the court to decide the balance between motorized and non-motorized use or to ultimately resolve all the disagreements about balance of recognition uses. We're asking for a remand for more study and review. We also do argue for a supplemental EIS on the change from the draft EIS to the final EIS, where the change was to prohibit all bicycle use in both the wilderness study areas. Clear change was substantial, reduced the mileage of trails open to bicycles by about 110 miles. It was also qualitative. The wilderness study areas, the Forest Service, after all, determined that three quarters of them aren't suitable for designation of wilderness. Different from the very distinct from the recommended wilderness areas in that regard. And the bicyclists were blindsided by that. It's also relevant to environmental concerns, is the other point I made. Contrary to what the utilities assert, if you just look at the NEPA regulations, 40 CFR 1508.14, social effects as well as economic must be addressed. Interrelated to impacts on physical environment, if you do anything. Council, you're down to around four and a half minutes, if you'd like to save the rest for rebuttal. I will do so, your honor. Thank you. Thank you. We will hear next from Mr. Brabender, and I hope I have not mispronounced your name. You got it right, your honor. Can you hear me? Yes. Okay. Yes, this is Alan Brabender on behalf of the federal defendants. And yes, I see I'm sharing time today. Let me begin a threshold issue, which is that this court lacks jurisdiction because plaintiffs do not appeal from a final appealable order. The district court remanded this matter back to the agency so that the agency could conduct a public comment period on the bicycle restrictions in the wilderness study area. Remand orders are generally not considered to be final. Council, I have a question about that issue. And I may be wrong about this, but it's my understanding that if there is a teeny tiny remand, let's say 99% is decided and 1%, just to be arbitrary, is remanded for a small thing, that we would have jurisdiction in that circumstance. And I want you to assume for the rest of my question that that's correct, and you can argue with it later. But if that is correct, and we have jurisdiction over the order that's 99% done and 1% remanded, do we have jurisdiction over that 1% issue as well? Which is what opposing counsel was just arguing about. Or would that be something that has to await further action by the agency? I think the question is whether or not the issues would be severable. So the 99% would be reviewable. The 1% would probably have to wait further action by the agency. And the facts that you are reciting are very similar to the CRF Forest legacy versus Sherman case that the plaintiffs rely on in their brief. And let me explain why this case is much different than Sherman. In Sherman, there was a very narrow remand. But the issue on appeal was the overall sufficiency of the EIS. And this court determined that basically no matter what happens on that limited remand, it will not affect the arguments with regard to the overall sufficiency of the EIS. And I think most compelling about Sherman, what probably most drove the decision in Sherman, was that the remand had already concluded in Sherman. And the agency did not make any changes as a result of that remand. So the remand had concluded by the time it came to the Ninth Circuit, which played, I think, a large role in the outcome of the Sherman case. But, of course, this case is much different because the issues on appeal are directly at issue in the remand, or they are intertwined with that issue. For instance, the plaintiffs claim that a supplemental draft EIS needs to be prepared in order to give the public an opportunity to comment on the bicycle restrictions in the wilderness study areas. But that's the very thing that the district court remanded for. And I think most... Well, that's why I asked the question I did, but their other arguments don't necessarily have anything to do with the remand. For example, the argument that this was just a political process and there were impermissible factors used and that sort of thing, that doesn't really have much to do with the bicycle remand. So that was the source of my question as to whether that piece of it can appropriately be carved out for later because it's about a very tiny piece of this, it seems to me. Well, let me explain where I was going next, Your Honor. It's because the district court ordered not only a remand, but the agency to make a new decision to decide whether to keep the existing rod in place or to modify it. So if the agency decides to modify the rod, it could do so in a way that cures the political interference concerns of the plaintiffs. It could also make major and minor modifications to the decision. It could allow bicycles back into the potential wilderness areas. It could allow motor vehicles back into the potential wilderness areas. That process is playing out right now. Excuse me, Mr. Raybender. Yes. Could it allow motor vehicles back in? Is that part of the remand? It is not part of the remand, but the Forest Service, of course, has that discretion if it wanted to. I think it's probably unlikely that's something the Forest Service would do. It strikes me as very unlikely given the remand. Correct, but again, the Forest Service could do that. It has the discretion, the lawful discretion to do that. But the point is the process is ongoing right now, and the court should allow that process to continue. If and when the agency makes a new decision, there will be final agency action. And the plaintiffs, if they're still harmed by the decision, can file a new lawsuit. And if they don't get the relief they seek from the district court, then they can appeal to this court. Is it your view that if that happened, there's a decision on the bicycle issue, and that even in your view is completely final, would all the other issues that are presently argued be available? Well, that depends on the... Or only the remanded issues. That's part of what I'm concerned about. Well, the whole case would be available, but if the agency, let's say, makes a new decision, there will be a new decision for this court to review, which, you know, there might not be these sort of... Well, I know, but let's just assume that they take their hard look and gather things, and they don't make any different decision, and we're back with the exact same thing. Are all the arguments now made going to be available at that time, or only the new things decided on remand? No, all of the issues would be available, Your Honor, if the agency decided to keep the existing decision. The plaintiffs could simply refile their briefs, I suppose. But now let me move on to even if this court finds that it does have appellate jurisdiction, it should affirm the agency on your district court on the issues that it found in favor of the agency. The decision to prohibit motor vehicles in the wilderness study areas and the recommended wilderness areas, which I will call the potential wilderness areas together, was reasonable, and it's supported by the administrative record. The agency had two independent rationales for prohibiting motor vehicles in these areas. The first was to preserve their wilderness character and potential to be included in the wilderness system, as required by the Wilderness Study Act. And the second was to promote more primitive forms of recreation in the Bitterroot, such as hiking to seek solitude away from the sights and sounds of the modern world. And let me begin with the latter because the plaintiffs don't even seem to challenge it, and that's that the restrictions were imposed in order to promote additional opportunities for primitive recreation. And let me start here by saying there's nothing, there's no provision of law whatsoever that requires the Forest Service to allow motorized recreation in the national forests. Rather, it has the discretion to do so under multiple use principles. Congress has instructed the Forest Service to manage the forest under the principle of multiple use, and it has listed several permissible uses, including fish and wildlife, wilderness, timber production, grazing, and outdoor recreation. And of course, these uses compete with each other for the limited forest resources. What's good for fish and wildlife is probably not going to be good for outdoor recreation. And even within the category of outdoor recreation, different types of recreation compete with each other. What's good for motor vehicle recreation is probably not good for hikers seeking solitude. So here, given that there are already over 2,000 miles of routes available to motorized vehicles, and the fact that there are decreasing opportunities for seeking solitude in the area because of the increased use, as well as the fact that due to modern technology, these machines are able to penetrate deeper and deeper into the forests, where they were simply not able to go decades ago. So what the Forest Service decided to do here was readjust the balance in its discretion to provide more opportunities for those people who want to seek solitude in the forest. And it did so in the areas that were most appropriate for doing so. That's the potential wilderness areas. Now, this was a reasonable decision. It's supported by the record, and it alone provides a basis for upholding the agency's decision. Now, the agency had another reason for restricting motor vehicles as well, and that was to maintain the wilderness character of these areas, as it is required to do by law. And I would say that the plaintiff's attacks on that rationale are based on the statements of law. It is, frankly, irrelevant that there is no evidence of physical damage to these areas. And it's irrelevant for a couple different reasons. First, as this court held in the Russell Country case, the Forest Service has the discretion to enhance the wilderness value of these areas. And the Forest Service can also proactively manage these areas to prevent any physical damage before it occurs. The other reason why a lack of physical damage is irrelevant is that wilderness value is not determined based on physical characteristics alone, but also its social value, for instance, its ability to provide for a primitive recreational experience. Now, given the increases in use that have occurred since 1977, it was reasonable for the Forest Service to find that there was a diminished wilderness character in these areas, even if there wasn't any physical scars. Sort of another misstatement of law that the plaintiff's arguments are, plaintiffs base their arguments, is this notion of proportionality, that any sort of decrease in access must be proportional to any increase in use. But again, that's simply not the law. As this court held in Russell Country, the Forest Service has the discretion to enhance the wilderness character of these areas because the Study Act creates a floor and not a ceiling for environmental protection. Now, the plaintiffs, they can quibble about the extent of the increase in the Bitterroot, but even they admit, as they must, that increase, that use has increased over the years and has changed over the years. What the plaintiffs are raising before this court is really sort of a policy disagreement, the Forest Service's decision to prohibit motor vehicle use. But that policy decision should be raised to the agency or should be raised to Congress. It is not a proper subject for a federal court. And with that, we would ask this court to dismiss for lack of jurisdiction or to affirm the district court on the issues decided in favor of the agency. Thank you very much. We will hear next from Mr. Presso. Yes, good afternoon, Your Honors. May it please the court, Timothy Presso for the Intervenor Conservation Groups. I'd like to begin by addressing Mr. Maynard's comments about the Stockman report because I think there is a sort of a misunderstanding in the appellant's arguments about how the Forest Service used that report. The Forest Service confronted incomplete information, to be sure. What it tried to do in that situation was to fill the gap in the best way that it could, and that was to extrapolate from user participation data and user day data to develop an estimate of likely increased use over time in the wilderness study areas. Now, there's no dispute that there has been an increase in user participation in the motorized and mechanized activities over time. The appellants seem to dispute that it's reasonable to make an extrapolation that imputes some of that increase into these affected wilderness quality limits. But most of their critique is focused on the specific conclusions of the Stockman report, which asserted a four- to nine-fold increase in use, and much of the briefing that's been offered by the appellants is calculated to essentially cast aspersions on those conclusions. I point out, however, for the court, the Forest Service did not rely on those specific conclusions. If we look at the record of decision, and particularly on page 521 of the excerpts of record, the Forest Service simply relied on the trend that was demonstrated and said, essentially, we can conclude that use in the wilderness study areas for these non-wilderness motorized and mechanized activities has more than doubled since 1977. So they took an extrapolative analysis that concluded four- to nine-fold increases and used it conservatively to say, we're not relying on those absolute values, but we see the trends. We understand there's been an increase in population in the Bitterroot area. At the same time, there's been an increase in participation in these non-wilderness activities, and we'll conservatively say there's an increase, and it's maybe not four to nine, but it's at least double as to what was happening in 1977. Now, in making that kind of determination, the Forest Service was doing exactly what this court instructed it to do in these kinds of situations under the Montana Wilderness Study Act in the McAllister case, where the court recognized that the Forest Service was often going to be confronted with incomplete and imperfect information in making these look-back analyses over 40 years of what's happened in these wilderness study areas, and said the Forest Service has to do the best it can with the data it has. And what's more, in the NEPA part of that McAllister case, this court recognized that the Forest Service may have to utilize theoretical approaches to analyze impacts. The Forest Service made a very reasonable effort to do that here, and the appellants have not offered any reason to conclude that all the trends we see elsewhere in the nation of increased use when you have increased population and increased participation in these activities somehow don't apply to the bitter. It was a very reasonable conclusion for the Forest Service to determine that they did. And as to the more, a little bit on a more specific level, as Judge Fletcher points out, it is undisputed there is no, there was no mountain biking in 1977. As the Forest Service pointed out, today mountain biking is not uncommon in many parts of these wilderness study areas. Not only do the appellants not dispute that, but their supplemental EIS claim relies on it because they assert the significance of the wilderness study area routes for bicycle access as a foundation for their supplemental EIS claim, which is incorrect for reasons I'll come to in a moment. But in any event, they can't have it both ways, saying these trails are so important to mountain bikers today that they needed a supplemental EIS, but there's no increase that the Forest Service could possibly take account of between zero mountain biking use in 1977 and not uncommon mountain biking use today. It's also significant, I think, Your Honor, that despite the arguments the appellants have advanced in their own briefing, they have conceded the increase they dispute. On pages 46 to 47 of their brief, they grudgingly acknowledge that the Stockman analysis supports a conclusion that use in the wilderness study areas has changed and likely increased since 1977. And at footnote five, they acknowledge that snowmobile use has increased. That's all that the Forest Service had to find in order to justify some corrective remedial measures for these areas. Now, the appellants also say, well, there were no physical scars. This is about social engineering. That, again, ignores the lessons of this court's McAllister case, where the court said it's not all about physical aspects of the landscape in terms of maintaining wilderness character. It is also about opportunities for solitude, which is about increased volume of non-wilderness uses. And as the court said, the obvious and potentially significant impacts that that increased volume of use has on wilderness character. So, again, they're blasting past the lesson of the McAllister case. I want to address this issue of the regional guidance and the role that it played in the Forest Service's decision. The appellants have asserted that there's something improper about the Bitterroot National Forest looking to a regional wilderness specialist's advice to craft the recommended wilderness prescriptions for this travel management plan. And it's been a theory in search of an analytical framework under the law, because in the district court, it was offered as a NEPA predetermination claim. Here before this court, with the benefit of the Supreme Court's census question case, the Department of Commerce case, it's been cast as a political interference case. But the bottom line is there is no authority that holds that this kind of internal guidance from a regional office to a local office of an agency is somehow improper political interference. Indeed, one wonders why the agency would have a regional wilderness specialist, if it were not to help the constituent local divisions of the agency work out these kinds of wilderness management questions. And one of the parts of the recommended wilderness management determination that the appellants particularly criticized is this forward-looking analysis that looked at the question of not allowing the increase that the Forest Service could see coming to change dramatically the status quo that had already changed somewhat since 1970s, 1980s, and not to build in a constituency that would be an immense obstacle to subsequent designation as wilderness of these areas that the Forest Service was recommending for designation as wilderness. And as to that rationale, I would submit to the court it was eminently reasonable and rational, and there was no better proof of that than if the court were to examine, I urge the court to do so, a letter from the Montana Fish, Wildlife, and Parks Agency that was submitted to the Forest Service during this administrative process. It's at page 342 of the intervener's supplemental excerpts of record. And what it does is it talks about the proliferation of unauthorized user-created trails that have already occurred, and then it looks at a study showing that the Bitterroot National Forest faces the highest threat in the nation of impacts from private land development outside forest boundaries and the off-road vehicle use that comes with that. And the state agency said, we need to deal with this now, not later. There was nothing unreasonable about the Forest Service taking an anticipatory preventative approach to protecting wilderness character. We urge the court to affirm the decision below. Thank you for your time this afternoon. Thank you, counsel. Mr. Mato, do you have some rebuttal time remaining? And I believe it's, yes, it's now on the clock. Thank you, Your Honor. Briefly on the federal jurisdictional argument, we don't think it has any merit. I think our reply brief, pages three to six, covers it. It was a very narrow remand. It doesn't, and it did not, the district court rejected the supplemental EIS argument. So there's no direction to reconsider that in the remand. It doesn't do anything for users besides the bicyclists, all the motorized snowmobiles and other users. In terms of what Mr. Brabender was saying, I can just see trying to come back with arguments that we're bringing here now. At a later date with some new rod that reaches the same result and being told it's the law of the case or whatever. It fits the Sierra Forest legacy case, very narrow, limited remand. Yes, it's still in process, but there's no reason to think it's going to do much of any of the claims before the court now. Turning to the rationale for the decision and the advocacy by both appellees for a proactive or looking forward, reasoned decision by the Forest Service that isn't dependent on any existing use impacts. It's just trying to prevent future impacts. And that decision being to totally prohibit all motorized and mechanized use in the entirety of the study areas, as well as the recommended areas that ultimately equates to what we've been arguing about and what we're a separate part of our claim. That the Forest Service decision is to manage these areas the same as their designated wilderness. And the Wilderness Act reserves that to Congress. And the Montana Wilderness Study Act and the Forest Plan allow for some continued uses. Forest Service can't do that without a rationed reasons support in the record type process that we've been arguing for here with actual data and analysis of actual use and effects of that use, as opposed to just a blanket prohibition without disregarding or without doing that analysis. In terms of the use, the rod itself indicates that the existing snowmobile use in the wilderness study area is three to four visits per weekend during the season. So if you more than double that use, you're still at eight, maybe 10 visits per weekend in an area that's thousands and thousands of acres. That's still several thousand acres per snowmobile. So an increase in use, yeah, there has been some. But the case law does not require the Forest Service to cut that off and prohibit it entirely. It requires them to do an analysis whether they're restricting it or allowing it. The lengths to which the Federal Appellate Council goes to say that no provision of law requires the Forest Service to provide motorized recreation, the Multiple Use Sustained Yield Act requires the Forest Service to provide recreation, as well as these other motorized uses, not just non-motorized recreation. And the Wilderness Act restricted the Forest Service's discretion in terms of managing areas as designated to wilderness is my response to that. The rod itself, again, I think it's a page, it said, Excerpts of Record 510 recognizes motorized use under the Multiple Use Sustained Yield Act as a legitimate and appropriate use of national forest and a need to strike a balance of uses. So that particularly hits us. Thank you, Counselor. You have used your time and the case just argued is submitted. We appreciate very much the arguments from all three of you.
judges: Graber, W. Fletcher, Freudenthal